Filed 5/15/25  P. v. Luevano CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B335698 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. |
| v. | No. BA502365) |
| RAUL LUEVANO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark K. Hanasono, Judge.  Affirmed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne and Deepti Vaadyala, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Raul Luevano appeals from a judgment of conviction after a jury found him guilty of committing a lewd act on his then-11-year-old niece. On appeal, Luevano contends the trial court erred in failing sua sponte to give a unanimity instruction, and the error was prejudicial. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *The Evidence at Trial*

When Karime M. was 10 years old, she and her sister Kimberly M. were removed from their parents' custody and placed in foster care; subsequently, they moved in with maternal aunt Jackie and maternal uncle Joel.[1] A year later Karime and Kimberly's mother gained sole custody of the children, and the family moved in with maternal great-aunt Irma M. (in Irma's Whittier home). Luevano, Karime's maternal uncle, lived in Las Vegas. Karime saw him once or twice a year at family gatherings, which usually occurred at maternal aunt Veronica's house in Los Angeles.

One weekend when Karime was 11 years old, she attended a family gathering at Veronica's house with Karime's maternal relatives, including Luevano. At 12 or 1 a.m., Karime went to the bedroom of her cousin Witzy (Veronica's daughter) to take a nap. Karime's family was not planning to stay for the night, and Karime decided to take a nap while she waited for the family to leave. When Karime entered the bedroom, then-six-year-old Witzy was asleep on one of the two twin beds. The only light in

_____

[1] Karime testified in December 2023, when she was 22 years old.

the bedroom came from the blue light of a television, which had a blank screen and no sound.

Karime fell asleep on the second bed on her stomach, wearing black leggings, a sweater, and red sneakers. Karime remembered "waking up and [Luevano] was rubbing [her] shoulders." She next heard Luevano ask in Spanish, "Do you want me to keep rubbing your shoulders?" Karime "didn't say anything," and when she moved her head and shoulders, wanting him to stop, he left the room. She "felt uncomfortable" because "he was drunk" and "it was weird." Karime had "no doubt at all" it was Luevano based on his "weird" and "high-pitched voice," which resulted from a childhood illness, and the smell of his strong cologne. Karime associated Luevano with the smell of a specific cologne that no one else in the family used.

Karime did not wake up Witzy to tell her what happened because Witzy "was young, and she was asleep." Karime added, "And I didn't think anything of it honestly. . . . I didn't see anything wrong with it at the time." Although it was "a little bit" unusual for Luevano to touch her shoulders while she was sleeping, Karime's family "used to be really affectionate," hugging and giving each other kisses on the cheeks.

After Luevano left, Karime fell asleep on her stomach. She woke up when Luevano grabbed her by the hips and pulled her legs to the side of the bed so the lower portion of her body was off the bed. Luevano then pulled her leggings and underwear down. Karime testified, "He just did it. He raped me." When asked what she felt, Karime stated, "I just remember, like, . . . feeling him inside me. Like, honestly, like, I remember it happening." In response to a question about what body part she felt, Karime said she felt his penis inside her vagina. When asked how she

3

felt while it was going on, Karime answered, "I remember just being . . . like frozen. . . . I feel like I was almost, like, paralyzed. Like, I couldn't move. I couldn't. I was just scared. . . . I was just really scared." Karime stated the rape "couldn't have been that long." When Luevano stopped, Karime felt her leggings being pulled up, and then Luevano left and the door closed. Witzy was still asleep. Karime again recognized Luevano based on the smell of his cologne and the sound of his voice.

Karime could not remember what happened after Luevano left, including how she left Veronica's home, because she was in shock. She also "blocked" out what had happened, except she recalled the shoulder rubbing and the vaginal pain she had inside the bedroom. During the following two weeks, Karime had unusually heavy bleeding. Karime testified, "[R]ight after that, I was bleeding like crazy. Like I would wake up and the blood would be down to my feet. I just—I couldn't stop bleeding." Karime told her mother and aunt Irma about the bleeding, but she explained, "We just didn't know why . . . I was bleeding so much." She had been getting her period for about a year, but she never had such heavy bleeding before. When asked whether she knew she "had been penetrated inside of that bedroom," Karime testified, "At that time, no, if I'm being honest. I feel like I blocked it out." Karime added that she "remember[ed] the shoulders," and she remembered feeling the vaginal pain when she was inside the bedroom, but as to the specifics, she "blocked it out." Karime testified she had never had sexual intercourse before that night.

Karime continued to see Luevano at family gatherings once or twice a year. But they did not talk unless they "had to." They never had a one-on-one conversation again. After it happened,

4

Karime did not tell anyone, but she did tell her cousins something like, "Just be careful with him. Like, he's kind of weird." Karime did not feel that way before the incident. One time when Karime was in high school, while she and her cousin America were sitting in America's bedroom, Karime said, "Be careful with him. . . . Don't be by yourself around him." But she did not tell America the specifics of what had happened.

When Karime was 20 years old, she recalled the rape while she was "being intimate" with her boyfriend. She was on her stomach when she "froze up," "freaked out," and started crying, as the memory of the rape came back to her. Karime went home, called her cousin America, and told her what had happened with Luevano, while America tried to calm her down. The next day Karime was not doing well, and Irma kept asking her what was wrong. Karime "broke down, and . . . told her everything." But, Karime continued, Irma had to "drag [the details] out of me." Karime was "really scared" to tell Irma about the rape because Karime knew her "family would just be completely like tore up about it," and she feared her maternal aunts and uncles would take Luevano's side.

Karime knew Irma was "old school," so she did not want to tell Irma, "Oh, I was having sex with my boyfriend." Karime instead told Irma she was watching a movie with a scene that made Karime remember what had happened. Irma was shocked but supportive, and she urged Karime to report the rape to the police. Karime initially refused because she did not want her other maternal relatives to abandon her. She explained "they were like everything to me" because she grew up with them more than her mother.

A few days after Karime told Irma about the rape, Karime, Irma, Irma's husband, and Kimberly were at their home. Karime told the group what had happened, while crying loudly and being very emotional. After Karime described the rape, Kimberly disclosed that in 2018 or 2019, when Kimberly was 12 or 13 years old, she was at a family gathering at her uncle Joel's house in Mexico when Luevano touched her breasts inside her shirt. Kimberly described at trial that Luevano was lying down on a sofa bed in the uncle's living room with a blanket on him. Kimberly was wearing a large sleeping shirt. She was tired, and Luevano lifted his blanket so she could lie down next to him. Kimberly lay on her stomach on the mattress, and Luevano put his arm around her and started rubbing her back outside her shirt. Luevano then moved his hand inside her shirt and, as Kimberly described, "was kind of touching my boobs." Kimberly "froze and . . . kind of stayed there." She did not say anything. Kimberly confirmed Luevano touched her bare breast with his hand, and he moved his hand around a little until his wife walked into the room, when he stopped. Kimberly had not previously disclosed this incident to anyone.

A few days after Karime made her disclosure to Irma, Irma told maternal aunt Clara about it. The other maternal relatives learned about the incident, and most of them stopped talking to Karime, Irma, and Kimberly. Shortly thereafter (on August 23, 2021), Karime went to the police station with her mother, Irma, and Kimberly, and Karime reported the rape.

On the morning of her trial testimony Kimberly told Karime that she had previously read Karime's diary. Kimberly did not tell this to Karime before because she did not want Karime to be mad. Karime then went with the investigating

6

officer to retrieve her diary from storage.  In a diary entry dated April 7, 2021, admitted into evidence, Karime wrote, "I realized something last night that I guess I knew this happened to me, but I chose not to remember it.  My [uncle] Raul raped me.  I honestly don't know if I'm making it up[.]  But this hurts so bad, and I remember everything about that moment: the scene, the lighting, the T.V., my clothes (blue long-sleeve with brown pad on elbows, black leggings, red converse).  He was wearing a white wife beater and jeans.  Witzy was sleeping in the bed next to us.  [¶]  I was sleeping when he came in, but I woke up as soon as he put his hands on my shoulders.  He rubbed my shoulders for a while and asked me if he should continue doing it.  I remember not saying anything.  I was so scared yet not that scared because it was my [uncle] Raul.  [¶]  For these years I thought that was all he did, that he just stopped and walked out.  But last night I was masturbating and my mind went back to that night, and it was like I was reliving everything as I was watching a movie.  That fucking disgusting piece of shit raped me.  I could feel him yesterday, smell him.  I remember he took my pants off.  [¶]  Oh my fucking God, I'm going crazy."

Karime testified she wrote in her diary that she did not know if she was making it up because she "was just really shocked," and she was in disbelief that she had "block[ed] something out like that," but  Luevano had raped her.  But Karime could "picture everything" and recalled the smell.  Karime denied making up the rape allegations.  She believed the rape caused her to have anxiety and nightmares.  In addition, since the incident she felt the need to lock her bedroom door and not have any blue light in the room while she slept.

The prosecution called Mindy Mechanic, a clinical and forensic psychologist, as a "blind expert" who was not aware of the facts in the case. Dr. Mechanic testified that if a victim is sexually assaulted by someone whom the victim knows and trusts, it is confusing to the victim and makes it "much harder to label or identify what's happening to the person as a crime or as a sexual assault." Although there is an expectation that the victim would physically fight back or yell and scream during the sexual assault, "in reality that doesn't happen a lot with adults or with kids" where the victim knows the perpetrator. The victim may freeze or have a numb reaction, which are trauma responses, because the victim is overwhelmed. Further, if the perpetrator is a relative, the victim may not report the sexual abuse in an effort to preserve the family relationship. Victims "can have full or partial amnesia for a traumatic event," and a subsequent event can trigger the victim to recall a traumatic memory. When a victim recalls the sexual assault years later, the victim may question whether it happened. Dr. Mechanic explained that when "extreme events" take place, the person could think, "'Did this really happen?,' whether it's a dream of good things or [a] nightmare of something awful. So that sense of reality, unreality, can pop in, especially if it's been a long time and a person is just now grappling with the memory after a long period in which they couldn't engage with the memory."[2]

---

[2] Luevano did not call any witnesses or present evidence at trial.

B.    *The Verdict and Sentencing*

The jury found Luevano guilty of committing a lewd act on a child under the age of 14 years (Pen. Code, § 288, subd. (a)).[3] The jury found true the aggravating circumstances that Karime was particularly vulnerable and Luevano took advantage of a position of trust to commit the offense.  (Cal. Rules of Court, rule 4.421(a)(3) & (a)(11).)  The trial court sentenced Luevano to the upper term of eight years in state prison.  Luevano timely appealed.

## DISCUSSION

A.    *Governing Law and Standard of Review*

"[T]he Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction" in federal or state court.  (*Ramos v. Louisiana* (2020) 590 U.S. 83, 93; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 877 (*Covarrubias*) ["In a criminal case, 'the jury must agree unanimously the defendant is guilty of a *specific* crime.'"].)  "A unanimity instruction is required if there is evidence that more than one crime occurred, each of which could provide the basis for conviction under a single count."  (*People v. Grimes* (2016) 1 Cal.5th 698, 727; accord, *People v. Russo* (2001) 25 Cal.4th 1124, 1132 ["when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act"].)

"This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the

---

[3]    Further statutory references are to the Penal Code.

9

jurors agree the defendant committed.' [Citation.] . . . 'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.'" (*Russo, supra*, 25 Cal.4th at p. 1132.) "'In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction.'" (*Covarrubias, supra*, 1 Cal.5th at p. 878; accord, *Russo*, at p. 1135.)

The trial court must give a unanimity instruction even absent a request "'"where the circumstances of the case so dictate."'" (*Covarrubias, supra*, 1 Cal.5th at p. 877; accord, *People v. Riel* (2000) 22 Cal.4th 1153, 1199.) "Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact" that is "predominantly legal." (*People v. Waidla* (2000) 22 Cal.4th 690, 733; accord, *People v. Sorden* (2021) 65 Cal.App.5th 582, 616 [applying de novo standard of review to whether "trial court erred in failing to, sua sponte, give a unanimity instruction"].)

B.    *The Trial Court Did Not Err in Failing To Give a*
       *Unanimity Instruction*

No unanimity instruction is required if the prosecution's election of an unlawful act as the basis of the charged offense is clearly communicated to the jury. (*People v. Jantz* (2006)

137 Cal.App.4th 1283, 1292 [no unanimity instruction was required for the offense of making a criminal threat where prosecutor informed jury in opening and closing argument of specific threat as basis for offense]; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455 [unanimity instruction not required where prosecutor "repeatedly asserted in argument to the jury that the crime was completed when defendant copied his employer's source code files and took them home for installation on his home computer" and "did not rely on defendant's alleged later use of the source code as a separate violation"]; cf. *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539 [trial court erred in not giving unanimity instruction where prosecutor in closing argument highlighted one of three threats but also addressed the other two].) "The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument." (*People v. Brown* (2017) 11 Cal.App.5th 332, 341 [no error in not giving unanimity instruction where prosecutor in closing argument relied on one of two rapes to support conviction]; see *People v. Mayer* (2003) 108 Cal.App.4th 403, 418-419 [prosecutor's statements and arguments focusing on one of two acts of soliciting perjury "were an election for jury unanimity purposes"].)[4]

---

[4]     There are other exceptions to the unanimity instruction requirement. "[N]o unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time.'" (*People v. Jennings* (2010) 50 Cal.4th 616, 679; accord, *People v. Sorden, supra,* 65 Cal.App.5th at p. 616;

The trial court in this case was not required to give a unanimity instruction because the prosecutor elected the specific act of rape, and not the shoulder rubbing, as the act relied on to prove Luevano committed a lewd act on a child under the age of 14 years.[5]  At the beginning of her opening statement, the prosecutor described what the case was about:  "[A]s a little girl between the ages of about 11 or 12 years old, you are going to hear that [Karime] was sexually violated, she was raped by her uncle, Raul Luevano."  Later in her opening statement, the prosecutor described the details the jury would hear about the night of the incident, starting with what Witzy's room looked like, what Karime did when she entered the bedroom, when Luevano entered and rubbed Karime's shoulders, how Karime could tell it was Luevano, and then the rape that occurred when Luevano

---

*People v. Jo* (2017) 15 Cal.App.5th 1128, 1178.)  In addition, "a unanimity instruction is not required if 'the defendant offered the same defense to both acts constituting the charged crime, so no juror could have believed defendant committed one act but disbelieved that he committed the other, or because "there was no evidence from which the jury could have found defendant was guilty of" the crime based on one act but not the other.'" (*Covarrubias, supra*, 1 Cal.5th at p. 879; accord, *Jennings*, at p. 679.)

[5]  Section 288, subdivision (a), provides in part, "[A] person who willfully and lewdly commits any lewd or lascivious act, . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."

returned. In her closing argument, the prosecutor reviewed the three elements the prosecution needed to prove, explaining, "So the first element is that the defendant willfully—willfully just means on purpose—touched any part of [Karime's] body either on her bare skin or through her clothing. Now, this first element, touching someone inappropriately, even over their clothes, satisfies number one. But we have in this case far beyond that." The prosecutor proceeded to describe the shoulder rubbing and rape and concluded, "That's what the evidence in this case has shown."

The prosecutor then addressed the second element: "Element 2, when the defendant acted, he had the intent—his mind, purpose—was to arouse, appeal to, or gratify the lust, passions, of himself. This element allows it to be for the lusts or passions of the child. But as it applies in this case, I think it's pretty straightforward that a man in his mid 30's, you heard his birthday was 1976—this happened in 2011, 2012, a man in his mid 30's walks in a room, knowingly removes the clothing of a child 11 to 12 years old. Common sense tells us you do that for the lust, passions—you do that to gratify yourself, sexually gratify yourself. So this element is pretty straightforward and has been established."[6]

This record reflects the prosecutor's election of the rape as the basis for the offense. As discussed, the prosecutor began her opening statement by describing the nature of the case as one where Karime, at the age of 11 or 12 years old, "was sexually violated, she was raped by her uncle." And in her closing

---

[6] The prosecutor also argued the third element was met because Karime was 11 or 12 years old when the incident happened.

13

argument, the prosecutor argued with respect to the first element of a lewd act on a child that "touching someone inappropriately, even over their clothes" satisfied the element, but the evidence was "far beyond that," which was true only for the rape. Moreover, with respect to element 2—that Luevano acted with the specific intent to arouse or sexually gratify himself—the prosecutor argued this element was "straightforward" because Luevano was a man in his 30's who walked into the room and removed Karime's clothing. The prosecutor did not address any other evidence that could support the second element with respect to shoulder rubbing. Because the prosecutor elected to use the rape to prove the elements of lewd act on a child, no unanimity instruction was required.

## DISPOSITION

The judgment is affirmed.


FEUER, J.

We concur:


SEGAL, Acting P. J.    PULOS, J.*

---

*       Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14